UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X

BLAIR SHAND,

                Plaintiff,

-v-

KILOLO KIJAKAZI[1]
Acting Commissioner of Social Security,

                Defendant.

---------------------------------------------------------------------X

**OPINION &**
**ORDER**

22-CV-7479 (JLC)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   08/11/2023

**JAMES L. COTT, United States Magistrate Judge.**

      Blair Shand seeks judicial review of a final determination made by Kilolo Kijakazi, the Acting Commissioner of the Social Security Administration ("the Commissioner"), denying her application for disability insurance benefits under the Social Security Act ("SSA"). The parties have cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, Shand's motion is granted, the Commissioner's cross-motion is denied, and the case is remanded for further proceedings.

---

[1] Kilolo Kijakazi is now the Acting Commissioner of the Social Security Administration. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is substituted as the defendant in this action.

## I.   BACKGROUND

### A. Procedural History

Shand filed for Social Security Supplemental Security Income ("SSI") on

September 18, 2019, alleging a disability onset date of March 3, 2019.

Administrative Record ("AR"), Dkt. No. 12, at 236.[2]  Five days later, on September

23, 2019, Shand filed a separate application for Disability Insurance Benefits

("DIB").  *Id.* at 242.  The Social Security Administration denied her initial claim on

February 13, 2020, and denied her request for reconsideration on July 30, 2020.  *Id.*

at 15.  Shand requested a hearing before an Administrative Law Judge ("ALJ") on

September 30, 2020.  *Id.*  On January 22, 2021, ALJ Selwyn Waters held a hearing

by telephone at which Shand testified, represented by counsel.  *Id.* at 43–63.[3]  The

ALJ denied Shand's application on April 28, 2021.  *Id.* at 12–27.  Shand then filed a

request for review with the Appeals Council on May 12, 2021, which was denied on

July 27, 2022, rendering the ALJ's decision final.  *Id.* at 1, 4.

Shand timely commenced this action on September 1, 2022, seeking judicial

review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  *See*

Complaint ("Compl."), Dkt. No. 1.  The Commissioner answered Shand's Complaint

---

[2] Unless otherwise specified, the page numbers refer to the sequential numbering of
the Administrative Record provided on the bottom right corner of the page, not the
numbers produced by the Electronic Case Filing ("ECF") System.

[3] The ALJ hearing transcript states that Shand and her counsel appeared at the
hearing in person.  AR at 45.  This appears to be incorrect, as the ALJ noted at the
outset of the hearing that the proceedings were held by telephone conference call
due to the circumstances surrounding the COVID-19 pandemic.  *Id.*

by filing the administrative record on December 16, 2022.  Dkt. No. 12.  On

February 15, 2023, Shand moved for judgment on the pleadings and submitted a

memorandum of law in support of her motion.  Plaintiff's Motion for Judgment on

the Pleadings, Dkt. No. 13; Memorandum of Law in Support of Plaintiff's Motion for

Judgment on the Pleadings ("Pl. Mem."), Dkt. No. 14.  The Commissioner cross-

moved for judgment on the pleadings on April 17, 2023, and submitted a

memorandum in support of her motion.  Defendant's Motion for Judgment on the

Pleadings, Dkt. No. 15; Memorandum of Law in Opposition to Plaintiff's Motion for

Judgment on the Pleadings ("Def. Mem."), Dkt. No. 16.  On May 9, 2023, Shand

submitted reply papers.  Reply Memorandum of Law in Support of Plaintiff's

Motion for Judgment on the Pleadings ("Pl. Reply"), Dkt. No. 18.

The parties consented to my jurisdiction on November 10, 2022.  Dkt No. 11.

### B. Administrative Record

#### 1. The Hearing Before the ALJ

The hearing was held in the Bronx before ALJ Waters on January 22, 2021.

AR at 43.  Shand, represented by counsel, appeared by telephone.  *Id.* at 45.

Vocational Expert ("VE") Helene Feldman also appeared by telephone.  *Id.* at 58.

At the time of the hearing, Shand was 34 years old and lived in an apartment

in the Bronx with her four-month-old son.  *Id.* at 45, 48.  She testified that she

completed high school, *id.* at 59, and used to be a hairdresser but stopped working

in March 2020.  *Id.* at 60.  Shand also previously worked as a cashier, nurse's

assistant, and counselor for individuals with developmental disabilities.  *Id.* at 59–

60.

3

Shand testified that she suffers from reduced functionality in her wrists, ankles, and feet.  *Id.* at 51–54.  She alleged that her symptoms began in 2016 and worsened over time.  *Id.* at 51.  Her attorney characterized her wrist impairments as "repetitive use injuries," likely stemming from her work as a hairdresser.  *Id.* at 47.  Shand testified that, beginning in 2018, common tasks, such as opening doors or putting on clothes, cause her wrists to "lock[] up" from swelling and pain.  *Id.* at 51–54.  She also stated that standing or walking for more than 30 minutes causes pain, swelling, numbness, and tingling in her feet, *id.* at 53, 56, and that she received bi-monthly cortisone shots to her wrists and feet to manage her pain, but that the relief was "not lasting."  *Id.* at 51, 53.  Shand cited increasing wrist pain as the reason why she stopped working after March 2020.  *Id.* at 51, 60.

Shand testified that her physical impairments (in both her wrists and feet) limit her daily activity.  *Id.* at 48–51.  For example, she explained that she cannot lift more than five pounds with her dominant right hand and, consequently, she often has difficulty opening the front gate of her apartment or carrying her infant son around her home.  *Id.* at 48, 57.  She stated that she struggles to use zippers and buttons due to her reduced grip strength.  *Id.* at 57.  She also testified that while she can dress and bathe herself without assistance, these activities take longer than normal.  *Id.*  Regarding her ankle and foot impairments, Shand testified that her foot pain restricts her from traveling more than 10 to 15 blocks from her apartment on foot.  *Id.*

The ALJ then questioned the VE.  *Id.* at 61.  The ALJ asked the VE to assume an individual with the same age, education, and work experience as Shand who "can lift and/or carry up to 20 pounds occasionally, lift and/or carry up to 10 pounds frequently, stand and/or walk for a total of six hours and sit for a total of six hours in an eight-hour workday with normal breaks."  *Id.* at 62.  When asked if such an individual could perform the work of a cashier, hairdresser, or nurse's assistant, the VE answered that the individual could work as a cashier or hairdresser.  *Id.*

The ALJ then asked the VE to consider if the hypothetical individual could "frequently climb ramps and stairs, occasionally climb ladders, ropes, and scaffolds . . . [and] [c]ould occasionally balance, stoop, kneel, crouch, and crawl."  *Id.*  The VE explained that such an individual could work as a hairdresser or cashier.  *Id.*  The ALJ again refined the hypothetical to include an individual who could "occasionally reach including overhead with the [dominant] upper extremity and could occasionally handle, finger, feel, push, and pull with the right upper extremity[.]"  *Id.*  The VE testified that such an individual could neither perform the work of a hairdresser nor that of a cashier.  *Id.*  The VE clarified that such an individual could perform certain jobs at a "light exertional level," such as an investigator-dealer accounts,[4] a counter clerk, or a furniture rental consultant.  *Id.* at 62–63.  The VE the concluded that, assuming the hypothetical individual could "frequently reach

---

[4] An investigator-dealer accounts, also known as a floor plan adjuster, is someone who verifies the authenticity of merchandise purchased through bank financing.  *See* U.S. DEP'T OF LABOR, DICTIONARY OF OCCUPATIONAL TITLES § 241.367-038 (4th ed. 1991).

including overhead, handle, finger, and feel with the [non-dominant] upper extremity," such an individual could also perform those three jobs. *Id.*

### 2. Relevant Medical Evidence

In her motion, Shand has provided a summary of the medical evidence contained in the administrative record. *See* Pl. Mem. at 6–9. The Commissioner has also provided a summary of the same. *See* Def. Mem. at 7–17. Having examined the record, the Court adopts the parties' summaries as accurate and complete for purposes of the issues raised in this action. *See, e.g., Thomas v. Saul*, No. 19-CV-6990 (MKV) (RWL), 2020 WL 5754672, at *1 (S.D.N.Y. July 24, 2020) (adopting parties' medical opinion summaries), *adopted sub nom. Thomas v. Comm'r of Soc. Sec.*, 2020 WL 4731421 (Aug. 14, 2020).

The Court will discuss the medical evidence pertinent to the adjudication of this case in Section II.B below.

### 3. The ALJ's Decision

The ALJ denied Shand's application in a 13-page decision on April 28, 2021. AR at 15–27. In doing so, he concluded that she was not disabled under sections 216(i) and 223(d) of the Social Security Act from September 18, 2019, through the date of the decision. *Id.*

Following the five-step test set forth in the SSA regulations, the ALJ first determined that Shand had not engaged in "substantial gainful activity" since the alleged onset date of March 3, 2019. *Id.* The ALJ noted that while Shand had continued to work after the alleged onset date, her earnings did not satisfy the SSA's definition of substantial gainful activity. *Id.*

At step two, the ALJ concluded that Shand had the following severe impairments: "[e]xtensor carpi ulnaris tendonitis of the right wrist, degenerative disc disease of the cervical spine, carpal tunnel syndrome, and obesity." *Id.* at 18. In this portion of the analysis, the ALJ also considered evidence of plantar fasciitis, Achilles tendinitis, attention deficit disorder, major depressive disorder, and anxiety disorder. *Id.* at 19–20. The ALJ concluded that her foot impairments were not severe because she received "no ongoing treatment" and had "not show[n] evidence of any significant ambulatory issues." *Id.* at 19.[5] The ALJ discussed and considered her psychiatric treatment notes and determined that her alleged mental impairments (*i.e.*, attention deficit disorder, major depressive disorder, and anxiety disorder) caused only "mild limitations" and thus were not severe. *Id.* at 20.

Proceeding to step three, the ALJ found that Shand's severe and non-severe impairments, considered singularly and in combination, did not satisfy any impairment listed in 20 CFR, Part 404, Subpart P, Appendix 1. *Id.* at 20–21. The ALJ considered whether Shand's degenerative disc disease could be a musculoskeletal disability as defined in Listing 1.15 but found that the lack of imaging or operative reports demonstrating a spinal impairment did not meet the requirements for a musculoskeletal disability. *Id.* at 20. The ALJ also considered

---

[5] For this conclusion, the ALJ cited to exhibits 4F and 13F of the administrative record, which correspond to Drs. Brian Dawson and Michael Healy's treatment notes. AR at 19 (citations omitted). Dr. Dawson "advised [Shand] to continue with [her] current course of rehabilitation and physical therapy" and observed that she experienced significant pain while standing and walking. *Id.* at 353–56. Dr. Healy's notes do not discuss whether Shand receives ongoing treatment for her foot impairments. *See id.* at 694–97.

her carpal tunnel syndrome as a possible "peripheral neuropath[y]" disorder under

Listing 11.14, but ultimately determined that she "ha[d] no more than mild

limitations" due to her symptoms.  *Id.* at 20–21.  Thus, the ALJ concluded that her

carpal tunnel did not satisfy Listing 11.14.  *Id.*

Before reaching step four, the ALJ determined Shand's residual functional

capacity ("RFC") by considering the entire record, including evidence of Shand's

severe and non-severe impairments.  *Id.* at 21.  The ALJ found that Shand had the

RFC to perform light work, noting that she

> could frequently climb ramps and stairs.  She could
> occasionally climb ladders, ropes, scaffolds, balance, stoop,
> kneel, crouch, and crawl.  She could reach (including
> overhead) with the dominant right upper extremity, and
> handle, finger, feel, push and pull.  Additionally[,]
> [Shand] could frequently reach (including overhead),
> handle, finger, and feel with the left upper extremity.

*Id.*  In so finding, the ALJ evaluated the credibility of Shand's testimony.  *Id.*  He

concluded that while some aspects of her testimony were credible and could

reasonably be expected to result from her medically determinable impairments,  her

statements were ultimately "inconsistent" with the medical record "because the

longitudinal medical evidence demonstrate[d] that [Shand's] severe impairments

[were] controlled with conservative and infrequent treatment, and medication."  *Id.*

at 23.  The ALJ further concluded that because Shand "ha[d] no difficulties with her

activities of daily living" such as "dress[ing], bath[ing], [or] groom[ing] herself," *id.*

at 21–22, her testimony concerning the intensity, pain, and limiting effects of her

impairments was inconsistent with the medical record.  *Id.* at 23.

The ALJ then considered the various medical opinions in the record. He first examined consultative internist Dr. Healy's opinion. *Id.* Dr. Healy opined that Shand had "mild limitations in grasping and holding objects" and had "possible mild limitations in standing, walking, and climbing stairs." *Id.* The ALJ found Dr. Healy's opinion persuasive, as it was consistent with Shand's history of carpal tunnel syndrome and plantar fasciitis. *Id.* at 23–24. Next, the ALJ considered the opinions of two state medical consultants, Drs. R. Uppal and A. Saeed,[6] who opined that Shand was limited to "occasionally carrying twenty [20] pounds," and could "stand, walk, or sit for about six hours" in a typical workday. *Id.* at 24. The ALJ found these opinions to be "somewhat persuasive," as they "did not include [the] manipulative limitations" which would be expected from Shand's decreased wrist functionality. *Id.* The ALJ also considered the opinion of Shand's podiatrist, Dr. Matvey Yagudayev,[7] who opined that Shand was "unable to perform normal work activities" and could "not stand longer than a two-hour period." *Id.* The ALJ found this opinion to be unpersuasive, as it was "not only inconsistent with [Shand's] testimony regarding her impairments and daily activities . . . but also inconsistent with the mostly unremarkable objective evidence in the record." *Id.* The ALJ next considered and found persuasive the opinion of Dr. Joshua Goldstein, a consultative

---

[6] Dr. Uppal's and Dr. Saeed's first names do not appear in the record. Only their first initials are listed. *See* AR at 65, 120.

[7] The ALJ refers to Shand's treating podiatrist as "Dr. Spielfogel." AR at 24. This appears to be an error, as the treatment note cited by the ALJ is signed by Dr. Yagudayev. *Id.* at 472.

psychiatrist. *Id.* Dr. Goldstein found that Shand had no limitations in mental functioning, which the ALJ noted was consistent with the opinion of two other medical consultants as well as evidence that Shand's attention deficit disorder and mood disorders were controlled with medication. *Id.*

At step four, the ALJ considered whether Shand could perform her past work. *Id.* at 25. The ALJ determined that because her RFC limits her to less than "light work" and includes manipulative limitations, she could not satisfy the physical requirements of being a hairdresser, cashier, or nurse's assistant. *Id.*

Proceeding to step five, the ALJ found that given Shand's "age, education, work experience, and [RFC]," there are jobs that "exist in significant numbers in the national economy that [Shand] can perform." *Id.* at 26. Citing the VE's testimony, the ALJ concluded that Shand could find roles such as an investigator-dealer accounts, a counter clerk, or a furniture rental consultant. *Id.* Accordingly, he determined that Shand was "not disabled." *Id.* at 26–27.

## II.   DISCUSSION

### A. Legal Standards

#### 1. Judicial Review of the Commissioner's Decision

An individual may obtain judicial review of a final decision of the Commissioner "in the district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether the decision is supported by "substantial evidence." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere scintilla. It

means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (cleaned up); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations . . . whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." (alteration in original) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

The substantial evidence standard is a "very deferential standard of review." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012).  The Court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a *de novo* review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (cleaned up).  "[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722

F.2d 1033, 1038 (2d Cir. 1983)).  On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing."  42 U.S.C. § 405(g).  However, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard, [the court has], on numerous occasions, remanded to the [Commissioner] for further development of the evidence."  *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (alteration in original) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)).

### 2.  Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); *see also Colgan v. Kijakazi*, 22 F.4th 353, 357 (2d Cir. 2022).  Physical or mental impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  "[T]he ALJ should consider not only whether Plaintiff was disabled at the time of the hearing, but also whether Plaintiff was entitled to disability benefits for any closed, continuous period . . . following the date of his claim." *Love v. Kijakazi*, No. 20-CV-1250 (EK), 2021 WL

5866490, at *5 (E.D.N.Y. Dec. 10, 2021) (quoting *Williams v. Colvin*, No. 15-CV-144

(WMS), 2016 WL 3085426, at *4 (W.D.N.Y. June 2, 2016)); *see also Milliken v. Saul*,

No. 19-CV-9371 (PED), 2021 WL 1030606, at *9 (S.D.N.Y. Mar. 17, 2021) ("A 'closed

period' of disability occurs where a claimant is found by the Commissioner to be

disabled for a finite period of time which began and ended prior to the date of the

agency's administrative determination of disability.").

In assessing a claimant's impairments and determining whether they meet

the statutory definition of disability, the Commissioner "must make a thorough

inquiry into the claimant's condition and must be mindful that 'the Social Security

Act is a remedial statute, to be broadly construed and liberally applied.'" *Mongeur*,

722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)).

Specifically, the Commissioner's decision must consider factors such as: "(1) the

objective medical facts; (2) diagnoses or medical opinions based on such facts; (3)

subjective evidence of pain or disability testified to by the claimant or others; and

(4) the claimant's educational background, age, and work experience." *Id.*

(citations omitted).

### a. Five-Step Inquiry

"The Social Security Administration has outlined a 'five-step, sequential

evaluation process' to determine whether a claimant is disabled[.]" *Estrella v.*

*Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019) (citations omitted); 20 C.F.R.

§ 404.1520(a)(4).  First, the Commissioner establishes whether the claimant is

presently employed.  *See* 20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is

unemployed, the Commissioner goes to the second step and determines whether the

claimant has a "severe" impairment restricting his or her ability to work.  20 C.F.R.

§ 404.1520(a)(4)(ii).  If the claimant has such an impairment, the Commissioner

moves to the third step and considers whether the medical severity of the

impairment "meets or equals" a listing in Appendix One of Subpart P of the

regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If so, the claimant is considered

disabled.  *See id.*; 20 C.F.R. § 404.1520(d).

If the claimant's impairment does not meet or equal a listed impairment,

then the Commissioner continues to the fourth step and determines whether the

claimant has the RFC to perform his or her past relevant work.  *See* 20 C.F.R.

§ 404.1520(a)(4)(iv).  Finally, if the claimant does not have the RFC to perform past

relevant work, the Commissioner completes the fifth step and ascertains whether

the claimant possesses the ability to perform any other work.  *See* 20 C.F.R.

§ 404.1520(a)(4)(v).

The claimant has the burden at the first four steps.  *Burgess v. Astrue*, 537

F.3d 117, 128 (2d Cir. 2008).  If the claimant is successful, the burden shifts to the

Commissioner at the fifth and final step, where the Commissioner must establish

that the claimant has the ability to perform some work in the national economy.

*See, e.g., Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b.  Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial."  *Sims

v. Apfel*, 530 U.S. 103, 110–11 (2000).  Consequently, "the social security ALJ,

unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop

the record in light of the essentially non-adversarial nature of a benefits

proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks omitted).  As part of this duty, the ALJ must "investigate the facts and develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at 111.  Specifically, under the applicable regulations, the ALJ is required to develop a claimant's complete medical history.  *Pratts*, 94 F.3d at 37 (citing 20 C.F.R. § 404.1512(d)–(f)).  This responsibility "encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." *Pena v. Astrue*, No. 07-CV-11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (citations omitted).

Whether the ALJ has satisfied this duty to develop the record is a threshold question.  Before determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record." *Scott v. Astrue*, No. 09-CV-3999 (KAM) (RLM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Hum. Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez ex rel. Silverio v. Barnhart*, No. 02-CV-5782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law.") (citing *Brown v. Apfel*, 174 F.3d 59 (2d Cir. 1999)).  The ALJ must develop the record even where the claimant has legal counsel. *See, e.g., Perez v. Chater*, 77 F.3d 41, 47 (2d

Cir. 1996).  Remand is appropriate where this duty is not discharged.  *See, e.g.*,

*Moran*, 569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not

supported by substantial evidence but because the ALJ should have developed a

more comprehensive record before making his decision.").

### c.  Evaluation of Medical Opinion Evidence

"Regardless of its source, the ALJ must evaluate every medical opinion in

determining whether a claimant is disabled under the [Social Security] Act."  *Pena*

*ex rel. E.R. v. Astrue*, No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y.

Mar. 25, 2013) (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)) (internal quotation

marks omitted).  For Supplemental Social Security Income and Social Security

Disability Insurance applications filed prior to March 27, 2017, SSA regulations set

forth the "treating physician rule," which required an ALJ to give more weight to

the opinions of physicians with the most significant clinical relationship with the

plaintiff.  20 C.F.R. §§ 404.1527(c)(2); 416.927(d)(2); *see also, e.g.*, *Taylor v.*

*Barnhart*, 117 F. App'x 139, 140 (2d Cir. 2004).  Under the treating physician rule,

an ALJ was required to give "good reasons," 20 C.F.R. § 404.1527(c)(2), if he

determined that a treating physician's opinion was not entitled to "controlling

weight," or at least "more weight," than the opinions of non-treating and non-

examining sources.  *Gonzalez v. Apfel*, 113 F. Supp. 2d 580, 588 (S.D.N.Y. 2000).  In

addition, a consultative physician's opinion was generally entitled to "little weight."

*Giddings v. Astrue*, 333 F. App'x 649, 652 (2d Cir. 2009).

However, in January 2017, the SSA revised its regulations regarding the

evaluation of medical opinion for claims filed on or after March 27, 2017 (such as

Shand's claim in this case).  *See* REVISIONS TO THE RULES REGARDING THE

EVALUATION OF MEDICAL EVIDENCE, 82 Fed. Reg. 5844, 5869–70 (Jan. 18, 2017).  "In

implementing new regulations, the SSA has apparently sought to move away from a

perceived hierarchy of medical sources." *Velasquez v. Kijakazi*, No. 19-CV-9303

(DF), 2021 WL 4392986, at *19 (S.D.N.Y. Sept. 24, 2021) (citing 82 Fed. Reg. 5844).

The new regulations state that an ALJ need "not defer or give any specific

evidentiary weight, including controlling weight, to any medical opinion(s) or prior

administrative medical finding(s), including those from [a claimant's] medical

sources." *Id.* (quoting 20 C.F.R. §§ 404.1520c(a), 416.1520c(a)).  "Instead, an ALJ is

to consider all medical opinions in the record and 'evaluate their persuasiveness'

based on the following five 'factors': (1) supportability, (2) consistency, (3)

relationship with the claimant, (4) specialization, and (5) any 'other' factor that

'tend[s] to support or contradict a medical opinion.'" *Id.* (quoting 20 C.F.R.

§§ 404.1520c(a)–(c), 416 920c(a)–(c)).

   Notwithstanding the requirement to "consider" all of these factors, the ALJ's

duty to articulate a rationale for each factor varies.  20 C.F.R. §§ 404.1520c(a)–(b),

416 920c(a)–(b).  Under the new regulations, the ALJ must "explain how he

considered" both the supportability and consistency factors, as they are "the most

important factors."  20 C.F.R. §§ 404.1520c(b)(2), 416.1520c(b)(2); *see also, e.g., Russ

v. Comm'r of Soc. Sec.*, 582 F. Supp. 3d 151, 160 (S.D.N.Y. 2022) ("[t]he new

regulations give most importance to two of the same factors previously considered to

determine whether a treating doctor's opinion should be given controlling weight,"

referring to the supportability and consistency factors).  Evaluating "supportability is an inquiry geared toward assessing how well a medical source supported and explained their opinion(s)."  *Acosta Cuevas v. Comm'r of Soc. Sec.*, No. 20-CV-502 (KMW) (KHP), 2021 WL 363682, at \*10 (S.D.N.Y. Jan. 29, 2021) *adopted*, 2022 WL 717612 (Mar. 10, 2022).  With regard to consistency, "the new rules provide that the greater the consistency between a particular medical source/opinion and the other evidence in the medical record, the stronger that medical opinion becomes."  *Id.* (citing 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(3)); *see generally* 42 U.S.C. § 423(d)(5)(B) (requiring ALJ to base decision on "all the evidence available in the [record]").

In addition, under the new regulations, the ALJ is required to consider, but need not explicitly discuss, the three remaining factors (relationship with the claimant, specialization, and other factors tending to support or contradict a medical opinion).  *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).  "[W]hen the opinions offered by two or more medical sources about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same, the ALJ [should] articulate how he considered the remaining factors in evaluating the opinions."  *Jacqueline L. v. Comm'r of Soc. Sec.*, 515 F. Supp. 3d 2, 8 (W.D.N.Y. 2021) (quotation marks removed) (citing 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3)).

Courts considering the application of the new regulations have concluded that "the factors are very similar to the analysis under the old [treating physician]

rule." *Velasquez*, 2021 WL 4392986, at *20 (quoting *Dany Z. v. Saul*, 531 F. Supp. 3d 871, 885 (D. Vt. 2021)); *see also Acosta Cuevas*, 2021 WL 363682, at *9 (collecting cases) ("the essence of the rule remains the same, and the factors to be considered in weighing the various medical opinions in a given claimant's medical history are substantially similar").  "This is not surprising considering that, under the old rule, an ALJ had to determine whether a treating physician's opinion was *supported* by well-accepted medical evidence and *not inconsistent* with the rest of the record before controlling weight could be assigned." *Acosta Cuevas*, 2021 WL 363682, at *9; *see also e.g., Andrew G. v. Comm'r of Soc. Sec.*, No. 19-CV-942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020) ("consistency and supportability" were foundation of treating physician rule).

"The failure to properly consider and apply" supportability and consistency "is grounds for remand." *Prieto v. Comm'r of Soc. Sec.*, No. 20-CV-3941 (RWL), 2021 WL 3475625, at *9 (S.D.N.Y. Aug. 6, 2021); *see also Rosario v. Comm'r of Soc. Sec.*, No. 20-CV-7749 (SLC), 2022 WL 819910, at *8 (S.D.N.Y. Mar. 18, 2022) ("ALJ must explain in all cases how [he or she] considered" supportability and consistency); *Rivera v. Comm'r of Soc. Sec.*, No. 19-CV-4630 (LJL) (BCM), 2020 WL 8167136, at *22 (S.D.N.Y. Dec. 30, 2020), *adopted by* 2021 WL 134945 (Jan. 14, 2021) (remanding so ALJ can "explicitly discuss both the supportability and consistency of the consulting examiners' opinions").  "An ALJ's failure to apply the correct legal standard constitutes reversible error if that failure might have affected the disposition of the case." *Lopez v. Berryhill*, 448 F. Supp. 3d 328, 341 (S.D.N.Y. 2020)

(citing *Kohler*, 546 F.3d at 265).  However, the Court need not remand the case if the ALJ only committed harmless error*, i.e.*, where the "application of the correct legal principles to the record could lead only to the same conclusion." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (alteration omitted) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

### d.  Claimant's Credibility

An ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court.  *Osorio v. Barnhart*, No. 04-CV-7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006).  "[A]s with any finding of fact, '[i]f the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints.'"  *Id.*  (quoting *Aponte v. Sec'y of Health & Hum. Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)).  Still, an ALJ's finding of credibility "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record."  *Pena*, 2008 WL 5111317, at *10 (internal quotation marks omitted) (quoting *Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988)).  "The ALJ must make this [credibility] determination 'in light of the objective medical evidence and other evidence regarding the true extent of the alleged symptoms.'"  *Id.* (quoting *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984)).

SSA regulations provide that statements of subjective pain and other symptoms alone cannot establish a disability.  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)).  The ALJ must follow a two-step framework for evaluating allegations of pain and other limitations.  *Id.*  First, the

ALJ considers whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the symptoms alleged. *Id.* (citing 20 C.F.R. § 404.1529(b)).  "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record." *Id.* (citing 20 C.F.R. § 404.1529(a)). The kinds of evidence that the ALJ must consider (in addition to objective medical evidence) include:

> 1. The individual's daily activities; 2. [t]he location, duration, frequency, and intensity of the individual's pain or other symptoms; 3. [f]actors that precipitate and aggravate the symptoms; 4. [t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5. [t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6. [a]ny measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7. [a]ny other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Pena*, 2008 WL 5111317, at *11 (citing Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at *3 (SSA July 2, 1996)).  The ALJ need not list "each of the seven factors" in his decision, as long as it shows he evaluated claimant's credibility "by considering all of the relevant evidence." *See, e.g., Lane v. Saul*, No. 18-CV-5523 (PGG) (OTW), 2020 WL 3965257, at *9 (S.D.N.Y. Mar. 16, 2020) (citation omitted), *adopted by* 2020 WL 1876325 (Apr. 15, 2020).

### B. Analysis

Shand contends that her case should be remanded because the ALJ failed to properly assess (1) the severity of her bilateral foot impairments, (2) her RFC, and (3) her credibility.  Pl. Mem. at 12–15.  The Commissioner counters that the ALJ's decision should be affirmed because it was supported by substantial evidence and properly considered the subjects with which Shand takes issue.  Def. Mem. at 15–24.  For the following reasons, the Court agrees with Shand.[8]

#### 1.  The ALJ Failed to Fully Develop the Record as to Shand's Foot Impairments

Before turning to the arguments raised by the parties, the Court must first determine whether the ALJ fulfilled his duty to fully develop the record.  *See, e.g., Echevarria*, 685 F.2d at 755 ("[I]n deciding whether the Secretary's conclusions . . . are supported by substantial evidence, which is the test on review, . . . we must first satisfy ourselves that the claimant has had 'a full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act.'" (citations omitted)); *Paterson v. Colvin*, No. 12-CV-3020 (LTS) (JLC), 2014 WL 4419688, at *8 (S.D.N.Y. Sept. 9, 2014) (citing same), *adopted by* 2014 WL 4977493 (Oct. 3, 2014).  "Whether the ALJ failed to develop the record adequately must be addressed as a threshold issue."  *Jackson v. Colvin*, No. 13-CV-5655 (AJN) (SN), 2014 WL 4695080, at *18 (S.D.N.Y. Sept. 3, 2014).  Even if the ALJ's decision is ultimately supported

---

[8] As Shand has not taken issue with the ALJ's assessment of her mental impairments, this opinion will address her claims only as they relate to her physical impairments.

by substantial evidence, a court cannot reach this conclusion where the decision was based on an incomplete record. *Id.*

       **a. The ALJ Failed to Fully Develop the Record by Not Commissioning a Functional Assessment of Shand's Foot Impairments**

The ALJ failed to fully develop the record by not commissioning a functional assessment to resolve inconsistencies among the medical opinions as to Shand's foot impairments. "In some situations, [an ALJ] may not be able to make [a] determination or decision because the evidence in [the claimant's] case record is . . . inconsistent." 20 C.F.R. § 404.1520(b). "[E]vidence [is] inconsistent when it conflicts with other evidence, contains an internal conflict, is ambiguous, or when the medical evidence does not appear to be based on medically acceptable clinical or laboratory diagnostic techniques." *Id.* As part of his duty to develop the record, an ALJ must "attempt to resolve inconsistencies or insufficiencies in the medical record[.]" *Cancel v. Colvin*, 14-CV-2034 (PKC), 2015 WL 865479, at *4 (S.D.N.Y. Mar. 2, 2015); *see also Gabrielsen v. Colvin*, 12-CV-5694 (KMK) (PED), 2015 WL 4597548, at *6 (S.D.N.Y. July 30, 2015) ("[I]n some cases, the nature of the record may render re-contacting the treating physician the best, if not the only, way to address gaps or inconsistencies in the record, such that it is incumbent upon the ALJ to do so."). "Courts in this Circuit have consistently held, albeit . . . in the treating physicians context, that when an ALJ has to determine an RFC, their failure to request a functional assessment when no such assessment exists in the record, or when any such assessments are insufficient, is a failure of their duty to develop the record." *Acosta Cuevas*, 2021 WL 363682 at *11 (citation omitted).

In this case, the ALJ should have commissioned a functional assessment of Shand's feet, as there were conflicting opinions in the medical record about the impact of her foot impairments on her RFC.  Multiple orthopedic surgeons, for example, describe Shand as being between 50 and 100 percent disabled based, in part, on her foot impairments.  *See, e.g.,* AR at 355, 576, 578, 589.  A consultative podiatrist (Dr. Dawson) opined that she was "markedly disabled," AR at 425, and her treating podiatrist (Dr. Yagudayev) opined that she was entirely "unable to perform normal work activities."  AR at 472.  Contrariwise, a consultative examiner (Dr. Albus) concluded that Shand's wrist and foot impairments required "no further treatment" and she could "return to work without any restrictions," AR at 740, and two state medical consultants (Drs. Uppal and Saeed) determined that Shand could "stand [and] . . . walk . . . for about six hours in a typical workday[.]"  AR at 24.

Considering how widely these opinions vary, the ALJ should have contacted either Dr. Dawson or Dr. Yagudayev to provide an expert opinion as to the inconsistent medical evidence.[9]  *See, e.g., Freeman v. Comm'r of Soc. Sec.*, 19-CV-68, 2020 WL 3819087, at *4 (W.D.N.Y. July 8, 2020) ("[A]n ALJ has an 'obligation to contact the claimant's treating physician in cases where the medical record is insufficient, conflicting, or unclear.'" (quoting *Selian*, 708 F.3d at 421)).  The ALJ's failure to do so is legal error and warrants remand.  *Id.*

---

[9] The record indicates that on January 22, 2021, the ALJ directed Shand's counsel to obtain additional records from Dr. Yagudayev.  AR at 52.  However, this request was limited to records of Dr. Yagudayev's initial opinion and did not include a request for a new functional assessment.  *Id.*

>    **b. The ALJ Should Have Further Developed the Record
>        as to Whether Shand Received Ongoing Treatment for
>        Her Foot Impairments**

The ALJ further erred by failing to fully develop the record as to whether Shand received ongoing treatment for her foot impairments.  "[A]n ALJ is not required to attempt to obtain additional evidence to fill *any* gap in the medical evidence; rather an ALJ is required to do so only where the facts of the particular [c]ase suggest that further development is necessary to evaluate the claimant's condition fairly."  *Petrovic v. Comm'r of Soc. Sec.*, No. 15-CV-2194 (KMK) (PED), 2016 WL 6084069, at *10 (S.D.N.Y. Aug. 25, 2016) (citation omitted).

At step two of his analysis, the ALJ remarked that Shand's foot impairments were non-severe because she received "no ongoing treatment."  AR at 19.  However, there is a gap in the record as to whether she did, in fact, receive ongoing treatment. Shand testified, for example, that she received cortisone shots in her feet— alternating the foot each week—about once a week for her first round of shots and then about "every six months," AR at 53, but the record only contains evidence of cortisone shots for her *wrists.  See, e.g., id.* at 51 (testimony describing six-month cortisone shot regime for pain in her wrists); *id.* at 348, 427 (progress notes written by Dr. Satish Reddy dated March 13, 2019) ("Pt's last cortisone shot was in Dec [2018], and last appointment was on Feb 26[th]"); *id.* at 508 (letter from Dr. Chae Boyd) ("[Shand] has been receiving cortisone injection in the wrist with mild relief until the last injection in July [2019] in which the cortisone injection did not help"); *id.* at 705 (progress notes from office visit with Dr. Boyd on August 5, 2019) ("Right wrist pain since 2016 and she get cortisone shots.  The last time she got a shot she

states that [i]t didn't really help."); *id.* at 748, 787 (evaluation by Dr. Gabriel Dassa dated February 10, 2020) ("The patient has had multiple cortisone injection to the right wrist, which the patient claimed did not improve the pain and she is currently receiv[ing] physical therapy and wearing the wrist brace for support and taking Motrin."); *see also id.* at 356 (Dr. Dassa) ("There is positive skin discoloration to the dorsum aspect of the right wrist from a prior cortisone injection, which was given by previous treating physician.").

Additionally, while the record suggests that Shand received physical therapy throughout 2019, *see, e.g.*, *id.* at 405–20 (treatment notes from BestCare Physical Therapy and Chiropractic, PLLC, from August to October 2019 indicating that "patient tolerated treatment well"), there remains a gap as to whether her therapy continued after 2019.  *Compare, e.g., id.* at 355 (Dr. Dawson) (writing on September 13, 2019, that he "advised the patient to continue with the current course of rehabilitation and physical therapy as needed") and *id.* at 421, 510, 583 (Dr. Maxim Tyorkin) ("The patient has had a short course of physical therapy."),[10] *with id.* at 425 (Dr. Dawson) (noting on November 1, 2019, that Shand "ha[d] not started [physical therapy] as her [workman's compensation] case [was] not yet established") and *id.* at 590 (Dr. Jurkowich) (Shand only "recently" stopped attending physical therapy due to the COVID-19 pandemic).

---

[10] Consulting physician and board-certified orthopedic surgeon Dr. Maxim Tyorkin examined Shand on September 24, 2019, and found her to be "totally disabled."  AR at 421–22, 510–11, 583–84.

Considering the evidence in the record that Shand received cortisone shots in her feet and was prescribed physical therapy, the lack of record evidence relating to cortisone shots or physical therapy is a significant gap in the record.  *See Echevarria*, 685 F.2d at 755–56 (ALJ's failure to reconcile ambiguities between claimant's testimony and the medical record was a "significant 'gap'" (citation omitted)).  Accordingly, because the ALJ's conclusion that Shand had "no ongoing treatment" for her foot impairments was based on an incomplete record, AR at 19, remand is appropriate on this basis as well.

### 2. The ALJ Failed to Properly Assess the Severity of Shand's Bilateral Foot Impairments and Her Credibility

Having determined that the ALJ did not fully develop the record by failing to (1) commission a functional assessment of Shand's feet, and (2) clarify whether Shand received ongoing cortisone shot treatments or physical therapy for her foot impairments, the Court need not reach Shand's other arguments.  Nonetheless, on remand the ALJ should also address the existing record evidence relating to Shand's physical therapy and cortisone shot treatments, particularly as they relate to the severity of Shand's foot impairments and her credibility.  *See, e.g., Smoker v. Saul*, No. 19-CV-1539 (AT) (JLC), 2020 WL 2212404, at *15 (S.D.N.Y. May 7, 2020) (directing ALJ to address additional issues on remand), *adopted by* Order dated May 26, 2020 (Dkt. No. 24).

Shand contends that the ALJ's severity finding is based on an incorrect application of the law and is not supported by substantial evidence because he overlooked records of her physical therapy and cortisone shot treatments, and thus

improperly assessed both (1) the severity of Shand's foot impairments, and (2) her credibility.  *See* Pl. Mem. at 13–16.  The Commissioner counters that the ALJ's findings as to both (1) the severity of Shand's bilateral foot impairments, and (2) Shand's subjective statements are supported by substantial evidence.  *See* Def. Mem. at 16–21, 24–26.  The Court agrees with Shand for the following reasons.

### a. The ALJ's Error in Assessing the Severity of Shand's Bilateral Foot Impairment Was Harmless

Shand contends that the ALJ erred at step two by failing to consider her plantar fasciitis and Achilles tendonitis as severe impairments.  Pl. Mem. at 13.  In response, the Commissioner argues that there is substantial evidence in the record to support the finding that Shand's foot impairments were not severe because they did not "significantly limit her ability to perform basic work activities."  Def. Mem. at 16.  While the ALJ erred by failing to properly evaluate record evidence demonstrating that Shand's foot impairments surpassed the *de minimis* standard, this error was harmless because he considered Shand's bilateral foot impairments later in his analysis.

At step two, "[a] finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work."  *Acosta v. Barnhart*, No. 99-CV-1355 (LAP) (AJP), 2003 WL 1877228, at *11 (S.D.N.Y. Apr. 10, 2003), *adopted by* Order dated June 12, 2003 (Dkt. No. 25).  "The Second Circuit has warned that the step two analysis may not do more than "screen out *de minimis* claims."  *Id.* (quoting *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995)).  However, "[t]he failure to address a

condition at step two will constitute harmless error, and therefore not warrant remand, if, after identifying other severe impairments, the ALJ considers the excluded conditions or symptoms in the subsequent steps and determines that they do not significantly limit the plaintiff's ability to perform basic work." *Eralte v. Colvin*, No. 14-CV-1745 (JCF), 2014 WL 7330441, at *10 (S.D.N.Y. Dec. 23, 2014) (citing *Reices–Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013)). "[W]hen functional effects of impairments . . . are . . . fully considered and factored into subsequent [RFC] assessments, a reviewing court can confidently conclude that the same result would have been reached absent the error." *Poles v. Berryhill*, No. 17-CV-6189 (MAT), 2018 WL 1471884, at *3 (W.D.N.Y. Mar. 26, 2018) (quoting *Snyder v. Colvin*, No. 13-CV-585 (GLS) (ESH), 2014 WL 3107962, at *5 (N.D.N.Y. July 8, 2014)).

Even though there are significant gaps in the record, as noted above, there is sufficient evidence in the record to establish Shand's plantar fasciitis and Achilles tendonitis had "more than [a] minimal effect on her ability to work." *Acosta*, 2003 WL 1877228, at *11. For example, Drs. Dawson and Yagudayev both opined that Shand's foot impairments would substantially limit her ability to work. AR at 352, 472. Specifically, Dr. Dawson reported that

> [Shand] states this pain began several years ago and has been worsening over time. She has pain in both the left and right heels. She has seen multiple podiatrists for this pain and has received custom insoles, steroid injections, and therapy which have improved pain, however pain does return after being back at work for several months. At this time the patient is unable to perform her job due to pain and the requirements of standing and walking.

29

AR at 352.  Similarly, Dr. Yagudayev noted that Shand was unable to stand for more than two hours at a time.  *Id.* at 472.  Moreover, Shand herself testified that she could not stand longer than 20 minutes or walk more than 15 blocks on foot.  *Id.* at 53, 56.  While the Commissioner argues that other opinions in the record, such as Drs. Uppal and Saeed's, undermine the limiting effects of Shand's foot impairments because they were "consistent with the demands of light work," Def. Mem. at 20, the step two *de minimis* standard only requires the ALJ to determine "slight abnormalities."  *Acosta*, 2003 WL 1877228, at *11.  Under such a standard, Shand's treating physician's reports, paired with her own testimony, sufficiently establish that her plantar fasciitis and Achilles tendonitis had a greater than minimal effect on her ability to work.  *Id.*  Thus, the ALJ erred in concluding that Shand's bilateral foot impairments were not severe.

Although the ALJ improperly discredited the severity of Shand's foot impairments during his RFC determination, the error was harmless, as the ALJ proceeded with the rest of the analysis.  *See Kessler v. Colvin*, 48 F. Supp. 3d 578, 593 (S.D.N.Y. 2014) (step two error harmless when ALJ continued with analysis and considered non-severe impairment in making RFC determination).  Here, the "ALJ identified at least one severe impairment at [s]tep [t]wo" and thus "properly proceeded with the remainder of the analysis," *id.,* by considering Shand's foot impairments in the final RFC determination.  AR at 24.  Thus, the Court can "confidently conclude that the same result would have been reached absent the error."  *Poles*, 2018 WL 1471884, at *3 (step two error harmless when ALJ considers

non-severe impairments in RFC determination).  The ALJ's determination that Shand's foot impairments were not severe therefore amounts to harmless error.  *Id.*

### b. The ALJ Failed to Properly Assess Shand's Credibility

Shand further contends that the ALJ erred in assessing her credibility by not articulating specific reasons for his credibility determination.  Pl. Mem. at 15.  The Commissioner counters that there was substantial evidence for the ALJ to conclude that Shand's statements concerning her wrist and foot impairments were not fully supported by the record.  Def. Mem. at 24.  Although, as noted above, it need not reach the issue of Shand's credibility (as it has already concluded that remand is appropriate for failure to fully develop the record), the Court has several concerns with respect to the ALJ's credibility determination.

The ALJ must follow a two-step framework for evaluating a claimant's credibility.  *See Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1529(a)).  First, the ALJ considers whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the symptoms alleged. *Id.* (citing 20 C.F.R. § 404.1529(b)).  "[A]t the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record."  *Id.* "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  SSR 16-3P, 2017 WL 5180304, at *11 (Oct. 25, 2017).  In making a credibility determination, the ALJ

must consider seven factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of claimant's pain and other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate the pain or other symptoms; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain or other symptoms. *See* 20 C.F.R. § 404.1529(c)(3)(i)–(vii); *see also McClinton v. Colvin*, No. 13-CV-8904 (CM) (MHD), 2015 WL 5157029, at *32 (S.D.N.Y. Sept. 2, 2015) (objective evidence alone did not substantiate extent of plaintiff's assertions and "triggered" need to evaluate credibility "with specific reference to the seven factors"), *adopted by* 2015 WL 6117633 (Oct. 16, 2015).

Here, the ALJ erred at step two of the credibility determination when he determined that Shand's statements about the intensity, persistence, and limiting effects of her symptoms were "inconsistent because the longitudinal medical evidence demonstrates that the claimant's severe impairments are controlled with conservative and infrequent treatment, along with medication." AR at 23. As Shand correctly observes, "the ALJ did not provide any valid explanation" as to why he believed that her impairments are controlled with conservative treatment. Pl. Mem. at 15. As noted above, SSA regulations require that an ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms . . . and

32

be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3P, 2017 WL 5180304, at *10; *see also Lane*, 2020 WL 3965257, at *9 (ALJ must show he evaluated claimaint's credibility "by considering all of the relevant evidence").

Not only did the ALJ fail to cite to the medical record in support of his determination that Shand's subjective statements were not credible, but upon the Court's review of the record, it is clear that Shand's treatment notes contradict the assertion that Shand's impairments are controlled with conservative and infrequent treatment. *See, e.g.*, *id.* at 350 (persistent wrist pain despite physical therapy), 353 (guarded prognosis despite corticosteroid injections), 582 (guarded prognosis following physical therapy), 482 (continued foot pain despite physical therapy), 588 (continued wrist pain despite physical therapy). As such, the ALJ's credibility determination cannot be said to be supported substantial evidence.

### 3. The ALJ's RFC Determination Was Not Supported by Substantial Evidence

Finally, Shand argues that the ALJ's RFC determination was not supported by substantial evidence because it did not account for the manipulative limitations caused by her severe carpal tunnel syndrome. Pl. Mem. at 13. The Commissioner concedes that the ALJ failed to include manipulative limitations in Shand's RFC, but contends that the omission of manipulative limitations was a harmless scrivener's error, and that the ALJ intended to limit Shand's RFC to "occasional" reaching and manipulation. Def. Mem. at 21–22. Again, though the Court need not reach this issue—and it agrees with the Commissioner that the omission was a

scrivener's error—it finds that the ALJ's RFC determination is deficient on other grounds that should be addressed on remand.

### a. The ALJ's Omission of Manipulative Limitations in Shand's RFC Was Harmless Error

Although the ALJ failed to include manipulative limitations in Shand's RFC, the omission was harmless error.  In determining a claimant's RFC, the ALJ must "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." *Mongelli v. Comm'r of Soc. Sec.*, No. 20-CV-8340 (ALC), 2022 WL 1094765, at *10 (S.D.N.Y. Apr. 12, 2022) (quoting SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996)).  These functions include "physical (standing, sitting, walking, lifting, carrying, pushing, pulling), mental (understanding, remembering, carrying out instructions, and responding to supervision), and other abilities that may be affected by impairments (seeing, hearing, ability to tolerate environmental factors)." *Id.*; *see also* 20 C.F.R. § 404.1545(b)–(d); 20 C.F.R. § 416.945.  Failure to make an "explicit" function-by-function analysis does not "per se" warrant remand.  *See e.g., Gomez v. Saul*, No. 19-CV-4708 (ALC), 2021 WL 1172674, at *13 (S.D.N.Y. Mar. 29, 2021) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013)).  "However, 'remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" *Id.* (quoting *Cichocki*, 729 F.3d at 177).

The ALJ's failure to explicitly include manipulative limitations in Shand's RFC was harmless error because he nonetheless considered such impairments when evaluating her capabilities.  For example, the ALJ commented that the findings of Drs. Uppal and Saeed were not persuasive because they did not "include manipulative limitations[,] which is inconsistent with decreased . . . strength in the right hand . . . [and] a slightly limited extension and flexion of the bilateral wrists[.]"  AR at 24.  Additionally, the ALJ's questioning of the VE indicates that he was mindful of Shand's manipulative limitations.  The ALJ asked the VE to consider the capabilities of a person who could "*occasionally* reach including overhead with the right upper extremity and could *occasionally* handle, finger, feel, push, and pull with the right upper extremity which is the dominate extremity."  AR at 62 (emphasis added).  Thus, it is evident that the ALJ proceeded through each step of the disability determination with the understanding that Shand could only occasionally "handle, finger, feel, push, and pull."  *Id.*  The omission of the word "occasionally" in the ALJ's final description of Shand's RFC at page 21 of the record can therefore be attributed to a harmless scrivener's error.  *See Zabala*, 595 F.3d at 409 (remand inappropriate when "application of the correct legal principles . . . could lead only to the same conclusion").

### b. The ALJ Failed to Properly Evaluate the Supportability and Consistency of the Medical Evidence in Determining Shand's RFC

Although Shand does not challenge the ALJ's compliance with the supportability and consistency requirements of 20 C.F.R. § 416.920(c), the Court addresses the issue *sua sponte*.  *See Rivas v. Berryhill*, No. 17-CV-5143 (ALC), 2018

WL 4666076, at *9, 14 (S.D.N.Y. Sept. 27, 2018) (doing same).  The Court concludes that the ALJ did not properly evaluate the supportability and consistency of the medical opinions concerning Shand's foot impairments.

"The ALJ's determination of [a claimant's] RFC turns in part on [his] consideration of the medical source opinions."  *Russ*, 582 F. Supp. 3d at 166.  When evaluating the persuasiveness of medical opinions, "[t]he most important factors [the ALJ] consider[s] . . . are supportability . . . and consistency[.]"  20 C.F.R. § 416.920(c)(a).  For each opinion, the ALJ must explain how he "considered" each factor "for a medical source's medical opinions or prior administrative medical finding."  20 C.F.R. § 416.920(c).  When the ALJ finds that "two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same," he must "articulate how [he] considered the other most persuasive factors" such as "relationship with the claimant," "length of the treatment relationship," "specialization," and other relevant factors.  20 C.F.R. §§ 416.920(b)–(c); *see also Jacqueline L.*, 515 F. Supp. 3d at 8 (discussing evaluation of medical opinions in the era after the "treating physician rule").  "Even though ALJs are no longer directed to afford controlling weight to treating source opinions . . . the regulations still recognize the 'foundational nature' of the observations of treating sources, and 'consistency with those observations is a factor in determining the value of any [treating source's] opinion.'"  *Shawn H. v. Comm'r of Soc. Sec.*, No. 19-CV-113, 2020

WL 3969879, at *6 (D. Vt. July 14, 2020) (alteration in original) (quoting *Barrett v.*
*Berryhill*, 906 F.3d 340, 343 (5th Cir. 2018)).

Here, the ALJ failed to properly evaluate the supportability and consistency
of Dr. Yagudayev's opinion as to Shand's foot impairments.  *See, e.g., Jacqueline L.*,
515 F. Supp. 3d at 8 (ALJ must explain supportability and consistency factors for
each medical opinion).  Dr. Yagudayev opined that Shand's bilateral foot
impairments rendered her entirely unable to work and limited her to standing for
less than two hours at a time.  AR at 472.  The ALJ described Dr. Yagudayev's
opinion as "inconsistent" with Shand's "testimony regarding her impairments and
daily activities" and the "mostly unremarkable objective evidence in the record."
AR at 24.  At the outset, this analysis is lacking for failure to address the
supportability of Dr. Yagudayev's opinion.  *See* 20 C.F.R. § 416.920(c).  While Dr.
Yagudayev's notes were themselves sparse, AR at 52,[11] the failure to address—or
even mention—the supportability of a treating physician's opinion before
disregarding it as "unpersuasive," AR at 24, is clear error.  *See Colgan*, 22 F.4th at
361 ("the evidentiary weight of a treating physician's medical opinion can [not] be
discounted by an ALJ based on the naked fact that it was provided in a check-box
form").

Furthermore, the ALJ's assessment of the consistency between Dr.
Yagudayev's opinion and Shand's testimony does not pass muster.  The ALJ offered

---

[11] As discussed *supra*, the ALJ observed at the hearing that Dr. Yagudayev's notes
did not include underlying records.  AR at 52.

no explanation as to why he believed that her testimony was inconsistent, thus

frustrating the Court's ability to provide "meaningful review."  *See Gomez*, 2021 WL

1172674, at *13 (remand appropriate where inadequacies in ALJ's analysis

frustrate meaningful review).  At the hearing before the ALJ, Shand testified that

she had not attended social functions on a regular basis since 2019, answered "no"

when asked if she had any hobbies, and explained that she "[could not] stand . . .

longer than 20 minutes" without experiencing "swelling," "numbness," and

"tingling[.]"  AR at 53–54.  It is unclear how the ALJ interpreted this testimony to

be inconsistent with Dr. Yagudayev's opinions, and without more from the ALJ, the

Court cannot conclude that this assessment of consistency is supported by

substantial evidence.

The Court similarly is left frustrated with the ALJ's determination that Dr.

Yagudayev's opinion was inconsistent with the objective medical evidence.  After

stating that the opinion was inconsistent, the ALJ cites to treatment notes relating

to Shand's wrists, not her feet.  *See* AR at 24 ("The undersigned finds [Yagudayev's]

opinion to be unpersuasive as this opinion is . . . inconsistent with mostly

unremarkable objective evidence in the record.  The record shows treatment notes

that most recently found the claimant had [full] strength in the left hand, but a

decreased 4/5 strength in the right hand.").  This lack of analysis is particularly

notable given that the ALJ also failed to address the opinion of Dr. Dawson—the

only other podiatrist in the record—who noted that Shand was "unable to perform

her job due to pain and the requirements of standing and walking" and determined

that she was "100% disabled." *See* AR at 352–55. The ALJ's failure to assess Dr. Dawson's opinions again constitutes clear error. *See* 20 C.F.R. § 416.920(c) (when evaluating medical opinion, ALJ "will" explain how he "considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical finding"). Accordingly, the ALJ's RFC determination with respect to Shand's bilateral foot impairments is not supported by substantial evidence. On remand, the ALJ should engage in a more thorough analysis as to the supportability and consistency of Dr. Yagudayev's and Dr. Dawson's opinions and, as appropriate, articulate the additional factors outlined in 20 C.F.R. § 416.920(c).

### III.   CONCLUSION

For all the foregoing reasons, Shand's motion for judgment on the pleadings is granted, and the Commissioner's cross-motion is denied. The Clerk is directed to mark the motion at Docket Number 13 as "Granted," and the motion at Docket Number 15 as "Denied," and enter judgment for Shand.

**SO ORDERED.**

Dated: August 11, 2023
    New York, New York

_____
JAMES L. COTT
United States Magistrate Judge